DANIEL L. DYSART, Judge.

\ .FACTS AND PROCEDURAL BACKGROUND

Defendant Peter Richard Rubens was charged by grand jury indictment with the second degree murder of Robert “Bobby” Irwin, a violation of La. R.S. 14:30.1. The Defendant pled not guilty at his October 15, 2008 arraignment. On January 9, 2009, the trial court heard and denied defendant’s motion to suppress the statement to the police. On June 26, 2009, the trial court denied defendant’s motion to suppress three voicemail messages he left. On August 18, 2009, the first day of defendant’s five-day jury trial, the trial court ruled that the State would not be able to use evidence of an incident involving another crime allegedly committed |2by him. The State filed a writ application, and this Court stayed the trial. On August 19, 2009, this court denied the State’s writ and lifted the stay. After deliberating for approximately one hour a jury found the defendant guilty as charged on August 24, 2009. Defendant filed a motion for a new trial on the date of sentencing, August 31, 2009, which the trial court denied. On that same date the trial court sentenced the defendant to life imprisonment at hard labor, without benefit of parole, probation or suspension of sentence. Defendant subsequently filed this appeal.
The defendant, Peter Richard Rubens, was a longtime resident of New Orleans who had worked as an artist and painter. After Hurricane Katrina, the defendant went into the construction business, repairing residences and structures that had been damaged by the storm. The victim, Robert Irwin, who was also known as “Bobby” or “B”, had worked for the defendant in various construction capacities including a laborer, carpenter and foreman. Prior to the date of the victim’s death on June 29, 2008, the defendant was living at 5036 South Prieur Street, a house that was owned by Ray Manning. Rubens was living there along with his girlfriend Diane Hoover. The house had been under repair for some months on an arrangement that had been worked out between Rubens and Manning that included Rubens living on the second floor of the residence while the repairs on the house were ongoing. Testimony at the trial revealed the arrangement between Rubens and Manning had soured somewhat, and Rubens had obtained an opportunity to land a lucrative construction job in Iowa. Along with a group of workers, Rubens planned on leaving for Iowa on June 29, 2008.
^Further testimony revealed that Robert Irwin was not one of the workers who was to accompany Rubens on the trip to Iowa. Witnesses at trial testified that Irwin had been having an affair with Rubens girlfriend, Diane Hoover for some period *36 of time. On Saturday, June 28, 2008 Robert Irwin spent the day in St. Rose with his friends Lynnette and Alan Betts. The Betts had been friends with Irwin for about two years. Irwin was in the process of purchasing the Betts’ motorhome which Irwin lived in and was parked in the driveway of the Betts’ home in New Orleans that was located across the street from 5036 South Prieur. Also spending Saturday June 28, 2008 with the victim were Jess Salt, son of Lynnette Betts, and Jess’ girlfriend and mother of their two small children, Emily Shelton.
On Sunday, June 29, 2008, Jess Salt drove Robert Irwin from St. Rose back to New Orleans. Also along for the trip were Emily Shelton and her two children. Over the weekend Irwin had told his friends of his problems with his former boss Peter Rubens. He knew that Rubens and a group of his workers were soon to leave for a job in Iowa, and he wanted to get back home in order to safeguard his tools and to confront Rubens regarding money owed to him. Irwin also told his friends that Diane Hoover was not going to Iowa with Rubens but that she was to stay in New Orleans and build a life with him. Lynnette Betts was concerned for Irwin to confront Rubens and stated, “He [Bobby] feels like somebody probably could die that night.” Jess Salt testified that Irwin told him on the ride from St. Rose to New Orleans, “If he [Rubens] pulls a gun on me, I will shove it up his a — .”
Despite these comments, Salt and his girlfriend Shelton both testified that Irwin’s demeanor was calm and relaxed when they reached the South Prieur Street address. The door to the home was open, and there were men on the porch and around the home. When Irwin exited the Salt vehicle, he left his bags as well as his l4dog “Tchoupi” and walked straight into the 5036 S. Prieur Street address. When Salt realized Irwin had left his bags and dog, he walked up to the residence and yelled for his friend “B.” Irwin came from inside of the house and told Salt all was fine, then gave him his keys so Salt could put his bags and dog in his motor home across the street. On his way back into the house Irwin joked with the men. Salt walked across the street to put Irwin’s bags and dog in his motor home. On the way back to his car, he heard the shots and a scream. Salt walked to the front of the house, where the men were running everywhere. When he reached the front steps of the house, he saw the defendant, Peter Rubens, who appeared on the porch and said to Salt, “You got a problem? I’ll put you down like I put ‘B’ down.” Salt did not see a gun, and told the defendant he would not leave until “B” came out. At this point, Salt saw his friend Irwin at the bottom of the front door. As he went to him, he could see that he had been shot, was suffering and moving only slightly. Salt ran out and called 911 when Ray Manning, the owner of 5036 South Prieur, walked up. Salt gave the phone to Manning, who gave the address to the 911 operator. Irwin expired when Salt returned inside.
New Orleans Police Department Homicide Detective Robert Long arrived on the scene approximately one and one-half hours after the shooting. The primary scene was in an office located on the second level of 5036 South Prieur Street, the residence of Ray Manning. Four .380 caliber spent shell casings and a spent bullet were recovered in the office. Det. Long’s investigation revealed that all the shots were fired in the office. The secondary scene was where the victim was found, on the first level of the residence, just below the stairwell. There was a blood trail where the victim apparently touched the wall and handrail of the stairwell as he went down the stairs. The victim was *37 lying on his back, face up. Peter Rubens |fiwas developed as a suspect, and an arrest warrant for his arrest for second degree murder was obtained at 11:55 p.m. on the night of the killing.
Det. Long searched for the defendant unsuccessfully. Later, he and Det. Weyshan returned to the Manning residence around 1:00 a.m. Det. Weyshan noticed that the front porch light that he had left on when they previously left the crime scene was off, and that a light was on in the second floor bedroom which had been turned off when they had left previously. A police tactical unit was called in and searched the residence. The defendant was apprehended inside the attic located on the third floor of the residence.
Det. Long advised the defendant of his rights at the scene, and defendant immediately began saying that he had to kill Bobby because Bobby was coming after him with a pencil. Det. Long asked defendant where the gun was, and defendant said he had dropped it by the body. He said if he had still had the gun, he would have killed himself. Defendant was taken back to the homicide office where Det. Long attempted to interview him, but the defendant invoked his right to counsel. Despite invoking his right to counsel defendant continued to state that he had to kill Bobby because Bobby came after him with a pencil. Defendant also said something to the effect that “my guys know what’s gonna happen to them if, if they don’t listen to me,” although Det. Long admitted that was not an exact quote. Det. Long contacted Det. Garcia, who had remained at the Manning residence, and asked her to conduct another canvas of the office to see if she could located a pencil out of place. There was no pencil out of place, and the gun was never found.

ERRORS PATENT

A review of the record reveals no errors patent on the face of the record.
| (ASSIGNMENT OF ERROR NO. 1

PRO SE ASSIGNMENT OF ERROR NO. 1

In both his first counseled assignment of error and his first pro se assignment of error, defendant argues that the evidence was insufficient to rule out beyond a reasonable doubt that defendant killed Bobby Irwin in self-defense.[1]
This court set forth the applicable standard of review for sufficiency of the evidence in State v. Huckabay, 2000-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the ra *38 tional trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green, supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Huckaby, 2000-1082, p. 32, 809 So.2d at 1111, quoting State v. Ragas, 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, 106-107.
Defendant was charged with and convicted of second degree murder, a violation of La. R.S. 14:30.1, “the killing of a human being” “[w]hen the offender has a specific intent to kill or to inflict great bodily harm.” La. R.S. 14:30.1(A)(1).
The defendant does not dispute that the evidence was sufficient to prove that he killed Bobby Irwin, but submits that the killing was justifiable as it was committed in self-defense under La. R.S. 14:20(A)(1), which provides that a homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger.
In a homicide case where the defendant asserts that he acted in self-defense, the State has the burden of establishing beyond a reasonable doubt that the defendant did not act in self-defense. State v. Taylor, 2003-1834, p. 7 (La.5/25/04), 875 So.2d 58, 63; State v. Sartain, 2008-0266, p. 27 (La.App. 4 Cir. 12/30/08), 2 So.3d 1132, 1148.
Here, the evidence revealed that the defendant fled the Manning residence immediately after the killing then later snuck back into the residence using a ladder to reach the second floor, and was found by police in an unfinished part of an attic which was accessible only through a small crawl space. Flight is a circumstance from which guilt can be inferred. State v. Smith, 98-2645, p. 5 (La.App. 4 Cir. 1/26/00), 752 So.2d 314, 317-318; State v. Recasner, 98-2518, p. 3 (La.App. 4 Cir. 12/22/99), 750 So.2d 336, 338.
| ^Defendant asserts that the evidence presented at trial did not exclude the reasonable hypothesis that defendant acted in self-defense, citing La. R.S. 15:438, which states that, assuming every fact to be proved that the circumstantial evidence tends to prove, in order to convict, such circumstantial evidence must exclude every. reasonable hypothesis of innocence.
However, as noted above, the circumstantial evidence rule is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate *39 appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt — all evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. Huckaby, supra.
Defendant argues that the hypothesis that Bobby Irwin attacked defendant and defendant killed him in self-defense “remains just as plausible as any other.” Defendant submits that Irwin prepared himself to confront defendant, told others he expected a violent result, and traveled a considerable distance for the purpose of accomplishing the confrontation. Defendant submits that all such behavior on Irwin’s part is entirely consistent with defendant’s assertion of self-defense. Defendant argues that the State presented a case that, except for its conclusion, supported the defense of justification.
Testimonial evidence showed that defendant owed Bobby Irwin some money for work Irwin had done, and that defendant also owed money to Diana Hoover, defendant’s girlfriend. The testimony presented in the State’s case strongly indicated that Bobby Irwin was having a sexual relationship with Diana Hoover, and that they planned on starting a life together.
State witnesses Dr. Nicholas Vergara and Angel Mitchell testified that in the week or so leading up to the killing, they had hired, and then fired, Rubens as a 19contractor on their home renovation project. Irwin had been working on the couple’s project as a foreman for Rubens, and they had asked Bobby Irwin to finish the project for them. Dr. Vergara testified that when Rubens was terminated, he did not use the term “fired,” because he knew the defendant was a volatile person, explosive in nature, and that he was armed at all times. During the week leading up to Irwin’s killing, Rubens had told Dr. Ver-gara that Bobby Irwin used drugs. This upset Irwin, who looked up to Rubens, but Dr. Vergara denied that Bobby was angry.
On the day before defendant killed Irwin, Rubens left what Vergara characterized as a threatening voicemail on his cellphone voicemail. In the voicemail, defendant angrily told Vergara that he needed to call defendant “immediately.” Referring to Vergara telling Bobby Irwin what defendant had said about Irwin, defendant said: “You gonna talk to ‘B’ and tell ‘B’ I talked bad about him and the other stuff. Let me tell you how this is gonna go dude. This goes my m — f—ng way. You gonna talk malo, we’re goin to the court lunas, Monday. Okay.... You understand me? You don’t talk s-t to me about construction or my people. You understand?”
Dr. Samantha Huber from the Orleans Parish Coroner’s office testified that a toxicology report performed on Robert Irwin after his death revealed the presence of alprazolam (“Xanax”), hydrocodone, and THC, the main component of marijuana, in his system at the time of his death. She testified that those drugs would tend to relax a person. Dr. Huber further testified that the victim sustained four gunshot wounds that would have all come from a distance of eighteen inches or less. Further, she did not feel that the victim showed any signs of being in a fight | inor a struggle before he was shot, and that the marks on him were consistent with where he fell after being shot and falling down at the bottom of the stairs.
The evidence at the trial did not indicate that Irwin was angry or upset when he walked into Manning’s residence or into the upstairs office to speak to defendant Rubens. In fact, the most critical witness for the State was Esteban Ruiz Servin. Servin was one of defendant’s workers, but he was not making the trip to Iowa. Instead, Rubens had commissioned Servin to *40 stay in New Orleans and continue to work on Rubens’ ongoing projects. Servin was upstairs in the second floor office of 5036 when Irwin first appeared and asked Ser-vin where was “jefe” (the boss man). Rubens was in another room looking for paperwork on the other jobs Servin was to take over. Irwin left the office, and when he returned, Irwin and Servin passed each other at the entrance to the second floor office. Servin did not hear any argument or struggle between Irwin and Rubens as he was going down the stairs, but moments after he passed Irwin, he heard the gunshots.
Based upon the testimony of Mr. Servin, the victim could have only been in the room with Rubens for moments before Rubens shot him. Servin was only a few feet away from passing the victim before he heard the gunshots, which indicates there was no heated argument or struggle before the victim was shot four times at point blank range. There was no evidence that any warning was uttered by defendant, who alleges that the victim was coming at him armed with a pencil. Defendant made the self-defense pencil attack claim after he fled the scene and was apprehended in the Manning residence. Det. Long testified that although the office was cluttered, it did not look as though it was the scene of a struggle or fight, and there was no pencil found out of place.
|n Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Bobby Irwin did not employ a pencil as an offensive weapon against defendant, or physically threaten the defendant in any other way that would have justified defendant to reasonably believe that he was in imminent danger of losing his life or receiving great bodily harm.
There is no merit to these assignments of error.

ASSIGNMENT OF ERROR NO. 2

In defendant’s counseled and pro se assignment of errors number two, he submits that the trial court erred in denying defendant’s motion for a new trial summarily and without a contradictory hearing.
At the sentencing hearing, the case was called and defense counsel stated:
MR. HESSLER:
Your Honor, ... this morning I filed a Motion for a New Trial. Um, ... for the reasons set forth in that motion, I would respectfully request this Honorable Court grant the Motion for New Trial.
THE COURT:
Okay. After review of your Motion for a New Trial, um, Mr. Hessler, um, the, the Court is of the opinion that a new trial isn’t warranted for the reasons that you have listed in the motion, so, at this time, the Court is going to deny it. MR. HESSLER:
Yes, ma’am. Your Honor, at this time, I’ve also filed Motion for Notice of Appeal and Designation of the Record ....
Defendant cites La.C.Cr.P. art. 852 in support of his argument that the trial court erred in denying his motion for new trial “summarily and without contradictory hearing.” La.C.Cr.P. art. 852 states:
A motion for a new trial shall be in writing, shall state the grounds upon which it is based, and shall be tried contradictorily with the district attorney.
|iaIn the instant case, defense counsel presented his motion for new trial, requesting that it be granted for the reasons set forth in the motion. Those grounds were: (1) that the verdict was contrary to *41 the law and to the evidence, as per La. C.Cr.P. art. 851(1); and (2) that the ends of justice would be served by the granting of a new trial, even though the defendant may not be entitled to a new trial as a matter of strict legal right, as per La. C.Cr.P. art. 851(5).
In both State v. Collins, 2010-1181, p. 11 (La.App. 4 Cir. 8/23/11), 62 So.3d 268, 275, and State v. Kelly, 2010-0853, p. 8 (La.App. 4 Cir. 12/12/10), 54 So.3d 1159, 1164, this Court found no merit to the defendants’ claims that the trial court erred in failing to afford them contradictory hearings on their motions for new trial. In each case, this Court noted that the respective records reflected that both defendants submitted their motions without argument, and there was nothing to suggest that the defendants intended to call any witnesses or submit any evidence in support of their motions, or that either was prevented from doing so.
Similar to Collins and Kelly, in the instant case, defendant submitted his motion for new trial without argument, and there was nothing to suggest that he intended to call any witnesses or submit any evidence in support of his motion, or that he was prevented from doing so. The record reflects that defendant submitted his motion for new trial “for the reasons set forth in that motion.”
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 3

PRO SE ASSIGNMENT OF ERROR NO. 3

In his third counseled assignment of error, defendant argues that the trial court erred in denying his motion for a mistrial based on the State’s alleged interference with a defense witness, Diana Hoover. Hoover did not testify, | ^allegedly due to her fear of being prosecuted for perjury. In his third pro se assignment of error, defendant addresses this same issue, arguing that the trial court erred and abused its discretion in denying defendant his right to present a defense.
Upon the motion of a defendant, a mistrial “shall be ordered” when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial. La.C.Cr.P. art. 775. The declaring of a mistrial is a drastic remedy which should only be declared upon a clear showing of prejudice by the defendant. State v. Leonard, 2005-1382, p. 11 (La.6/16/06), 932 So.2d 660, 667. The mere possibility of prejudice is insufficient to warrant a mistrial. Id. Mistrial is a drastic remedy, and is warranted only when the defendant has suffered substantial prejudice such that he cannot receive a fair trial. State v. Vincent, 2010-0764, p. 6 (La.App. 4 Cir. 1/19/11), 56 So.3d 408, 413, writ denied, 2011-0315 (La.6/17/11), 63 So.3d 1038. “The determination of whether actual prejudice has occurred, and thus whether a mistrial is warranted, lies within the sound discretion of the trial judge, and this decision will not be overturned on appeal absent an abuse of that discretion.” Id.; State v. Johnson, 2009-0706, p. 22 (La.App. 4 Cir. 5/26/10), 41 So.3d 1188, 1203.
Defense counsel notified the trial court that he had a defense witness under subpoena, Diana Hoover, who, according to testimony in the State’s case, had contemporaneous romantic relationships with the defendant and the victim. Defense counsel represented to the trial court that the State had informed Hoover at some point that she had perjured herself in her prior testimony, at a Prieur hearing, and was subject to being prosecuted for perjury. The following colloquy occurred:
MR. HESSLER:
*42 | uBut she indicated to rae that the State did tell her that she lied in that testimony and that she is subject to being prosecuted for perjury.
I — I clearly believe—
MR. BOURQUE:
That’s not exactly—
MR. HESSLER:
—as does she — I am just repeating what she said.
THE COURT:
Sure, okay. And so the issue—
MR. HESSLER:
And I clearly believe that that’s intimidating my witness and putting a chilling effect on her to keep her from — from testifying.
THE COURT:
Well, has the lady indicated to you, Mr. Hessler, that she will not be testifying for you?
MR. HESSLER:
Well, Your Honor, at this point it’s— it’s up in the air. I have got a — I have got a witness that’s intimidated, clearly intimidated and — and now I have got decisions to make.
THE COURT:
State, let me hear from you.
MR. BOURQUE:
Flatly, 100 percent there is no intimidation of Ms. Hoover by myself or anyone else from the State in any way, shape, or form.
I approached Ms. Hoover, identified myself, she knows who I am; told her— I asked her if anyone had explained to her the consequences for perjury, lying in a murder case, and that I didn’t — I was just made aware this week that the penalties are enhanced, depending on the type of case that you perjure yourself in. In a murder case, it’s 5 to 40 years.
And I asked her if she was aware of that. She said, no, nobody has told her anything. I said, “I don’t want to see you get wrapped up in this. I don’t want you to have to lie, if that’s what your intent is, I don’t want you to do that.” She said that she’s not lying.
At some point we did discuss the issue of the Prieur hearing and I suggested that — I never said that I will prosecute you for that. I never said that that’s on the table.
I indicated some disbelief as to the validity of the entirety of her statement that she made during the Prieur hearing, but at no point threatened her; at no point told her she would be prosecuted or that she could be prosecuted if something didn’t happen.
11SA11 I told her was that if she took the stand and lied in this case—
THE COURT:
This all sounds—
MR. BOURQUE:
—that’s perjury.
THE COURT:
—familiar to me. Didn’t we have this same—
MR. BOURQUE:
Yes, ma’am.
THE COURT:
—discussion last week?
MR. HESSLER:
Right, but I believe it happened again this morning. And, your Honor, I would ask that the Court call her in and question her and see what she says exactly happened. And, you know, there is an allegation made by her that — -that she was offered to be paid for her testimony.
Now, all I am saying, Your Honor, is — I am just saying the allegation she told me this morning. But the — the— the position that the D.A. just took was *43 that he “indicated some disbelief.” I would ask that you call Ms. Hoover in and ask her what she took away from that conversation, what was said—
THE COURT:
Okay, and let me say this, maybe the Court will do that, but at this time I would like to proceed with the trial. It’s not — the State is still putting on its case in chief. So, if we can allow that to happen—
MR. HESSLER:
Okay, I’ll — I’ll deal with that.
THE COURT:
—and I will call the lady in.
Is this lady a witness of the State’s? Possibly, okay.
Let’s go start completing the State’s case and prior to your case, if the issue still needs to be handled, we will deal with it.
MR. HESSLER:
Okay.
| mThe prosecutor represented to the court that he had not interviewed or spoken directly with Hoover until the week of trial, when he saw her in the hallway and spoke to her.
Following the presentation of the State’s case in chief, the issue of the alleged intimidation of Diana Hoover was again addressed in chambers. Defense counsel represented that the District Attorney, Leon C. Cannizzaro Jr., had told Hoover that morning, outside of the courtroom, to “[jjust tell the truth.” The State later stipulated that the District Attorney had told Hoover to tell the truth. The representations were that the District Attorney came into the courtroom to observe a portion of the trial proceedings, and at some point, either prior to entering or after leaving the courtroom, he spoke to Diana Hoover in the hallway. Defense counsel represented that Hoover had indicated to him that she felt threatened and intimidated by the District Attorney’s comments made that morning and during interviews with her, “and that she does not want to testify and will not testify in the defense case, if called to testify.”
The trial court noted that when testifying under oath one is expected to tell the truth, and that it could understand the State briefly stating to a witness, “Just tell the truth.” Defense counsel conceded that a brief “|j]ust tell the truth” statement in and of itself did not become anything, but it became more egregious in light of the fact that Hoover was a defense witness; that the State alleged her to have perjured herself once already; that the prosecutor making that allegation had the power to charge her and bring her to trial; and that the District Attorney himself told her in the hallway to “just tell the truth.” Defense counsel argued than an average person would feel intimated by those State actions.
|17Pefense counsel, for the second time, requested that Hoover be brought in and questioned, and counsel wanted to make certain the record reflected that she did not want to testify. The trial court then stated that it was not having counsel “go word for word,” and asked defense counsel if he intended to call Hoover as a witness, and whether she had been subpoenaed to testify that day. Defense counsel asked the court, for the third time, to bring Hoover in chambers to hear from her, saying again that he did not believe he could put her on as a witness. Defense counsel also represented that Hoover “told me she doesn’t really want to testify. She told me she won’t testify.”
Defense counsel also argued that if called, “she becomes a hostile witness because of the actions by the State.” Defense counsel requested, for a fourth time, *44 that the trial court hear from Hoover as to what the prosecutor and the District Attorney had said to her. The trial court stated that defense counsel was asking for the equivalent of a secondary hearing, and it noted that in fairness, the court would have to bring in the District Attorney and put him under oath. The court stated that the matter was something the court did not even need to entertain.
At that point, defense counsel moved for a mistrial on the grounds that he was effectively being denied a right to present a defense by the tactics of the District Attorney’s Office. Defense counsel noted that after meeting with “them,” apparently meaning one or more prosecutors, Hoover consulted someone about getting an attorney. In connection with the argument on defendant’s motion for mistrial, the trial prosecutor represented to the court that when he had talked to Diana Hoover during the trial and had questioned the truthfulness of her Prieur hearing testimony, Hoover told him that she was not going to lie. The trial court Indirectly asked defense counsel, for the record, if he had intended to call Hoover as a witness. Defense counsel replied in the affirmative.
After the State rested, immediately pri- or to defendant presenting what turned out to be his sole witness, the trial court advised defense counsel that it could order Hoover to testify, given that she was under subpoena. The court stated that beyond that, it was not going to entertain whether the District Attorney said “A” or “B” to her, and if a prosecutor said “A” or “B” to her. The court felt that the matter had no bearing on the trial proceedings. The trial court wanted Hoover to understand that the information she testified to in the Prieur hearing had already been ruled inadmissible; that this Court had denied the State’s writ application as to that ruling; and that she would not be coming to testify on anything that involved the Prieur hearing. The trial court offered to appoint an attorney to counsel Hoover.
Following the testimony of defendant’s only witness, the trial court, in chambers, stated that the only thing it was willing to do with regard to Diana Hoover was to order her to testify pursuant to her subpoena. The court advised defense counsel that it had requested that an attorney be called so she could be advised of her rights. The trial court asked defense counsel if he intended to call Hoover as a witness, and he replied that he could not call her under the circumstances. Defense counsel requested, for the fifth time, to have the court question Hoover and also requested to proffer her testimony, albeit with the questioning coming from the court, but the trial court denied those requests.
Here, counsel for defendant was given every opportunity to have Diana Hoover be compelled to testify. The trial court was willing to provide counsel to Diana Hoover if counsel for defendant called her as a witness, but counsel for defendant declined.
119It has been held that “[i]t is not improper per se for a trial court judge or prosecuting attorney to advise prospective witnesses of the penalties for testifying falsely.” United States v. Blackwell 694 F.2d 1325, 1334 (D.C.Cir.1982). However, warnings concerning the dangers of perjury cannot be emphasized to the point where they threaten and intimidate the witness into refusing to testify. Id.
A trial court has broad discretion and the duty to require that criminal proceedings be conducted in an orderly and expeditious manner and to so control the proceedings so that justice is done. State v. Washington, 614 So.2d 711, 713 (La. *45 1993), citing La.C.Cr.P. art. 17; see also State v. Reeves, 263 La. 923, 925, 269 So.2d 815, 816 (1972) (all matters pertaining to the conduct of the trial are within the sound discretion of the trial court, and its rulings on these matters will not be disturbed absent an abuse of discretion, citing La.C.Cr.P. art. 17).
Under the circumstances of the instant case, it cannot be said that the trial court abused its discretion in failing to hear from Diana Hoover regarding what the prosecutor and the District Attorney said to her regarding her Prieur testimony and any testimony she might give at trial.
There is no merit to these assignments of error.

ASSIGNMENT OF ERROR NO. 4

PRO SE ASSIGNMENT OF ERROR NO. 9

In these assignments of error, defendant argues that the trial court erred in admitting, over defense objection, evidence of other bad acts, in the form of voicemail messages he left on the cell phones of Angela Mitchell and her boyfriend Dr. Nicholas Vergara. In his ninth pro se assignment of error, defendant, in addition to arguing that the evidence was inadmissible in substance, also argues that it was inadmissible because it was admitted without a hearing.
l2nIn the voicemail message at issue left on Mitchell’s cell phone on the evening of Saturday, June 28, 2008, the day before the killing, defendant leaves an angry and threatening message regarding conversation(s) he had with Bobby Irwin.
The first voicemail defendant left on Dr. Vergara’s cell phone was left on June 21, 2008. In it, defendant apologized for failing to tell Vergara and Mitchell that he was not a licensed contractor, saying that he considered Vergara and Mitchell his friends, asking to get together to work out the terms of the contract, and concluding by saying “[t]hank you.”
The other voicemail from defendant that was introduced in evidence was characterized by Vergara as threatening. It was left on Saturday, June 28, 2008, the day before the killing. In it, defendant tersely told Vergara that he needed to call defendant “immediately.” Referring to Vergara telling Bobby Irwin what defendant had said about Irwin, defendant angrily said, in a rant: “You gonna talk to ‘B’ and tell ‘B’ I talked bad about him and the other stuff. Let me tell you how this is gonna go dude. This goes my m — f—ing way. You gonna talk malo, we’re goin to the court lunas, Monday. Okay.... You understand me? You don’t talk s-t to me about construction or my people. You understand?”
Defendant argues that evidence of what he characterizes as the “business relationship” between defendant and Vergara and Mitchell, which, at its core, was the topic of the voicemails, was not admissible under La. C.E. art. 404(B)(1), as it was not relevant for any permitted purpose under that article.
La. C.E. art. 404(B)(1) provides:
B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of |2imistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an inte *46 gral part of the act or transaction that is the subject of the present proceeding.
The erroneous introduction of evidence relating to a defendant’s prior bad acts risks “lur[ing] the fact-finder into declaring guilt on a ground different from proof specific to the offense charged ... [by] generalizing a defendant’s earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged....” State v. Ruiz, 2006-1755, p. 7 (La.4/11/07), 955 So.2d 81, 86, citing State v. Womack-Grey, 2000-1507, p. 1 (La.12/7/01), 805 So.2d 1116, quoting Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997).
“In order to avoid the unfair inference that a defendant committed a particular crime simply because he is a man of criminal [bad] character, evidence of the commission of other crimes [bad acts] is inadmissible unless the evidence has an independent relevancy besides simply showing a criminal disposition.” State v. Lafleur, 398 So.2d 1074, 1080 (La.1981). In Lafleur, the court noted that the prosecution’s case depended largely on inferences to be drawn from circumstantial evidence, and it said that any evidence tending to prove that the defendant had a motive or reason for committing the crime was extremely probative. Id.
In the instant ease, the State submitted that the voicemail messages were admissible as proof of motive, intent, and knowledge. “Motive” refers to the defendant having a reason to commit the crime he is charged with. Lafleur, supra. As in Lafleur, any evidence tending to prove that defendant had a motive or a reason for committing the crime he was charged with, killing Bobby Irwin under |22circumstances constituting second degree murder, was extremely probative. Evidence that little more than twenty-four hours before the killing, defendant was angry at the turn of events involving the renovation and addition work at the residence of Dr. Vergara and Angela Mitchell, and was demanding money from them to pay his workers, using an expletive and threatening to file a lien on their home, tended to support the view that he also may have been angry with Bobby Irwin because of Irwin’s role in that turn of events.
Similarly, evidence that little more than twenty-four hours before the killing, defendant was furious at Dr. Vergara for, among other things, telling Bobby Irwin what defendant had said about him using drugs, was circumstantial evidence tending to show that he was upset in general with a matter in which Irwin figured to a relatively significant degree. The evidence suggests that defendant was aware that Vergara and Mitchell were going to pay Bobby Irwin to supervise workers originally secured by defendant and work to complete the work at Vergara and Mitchell’s home. Vergara testified that when it was decided by him and Mitchell that defendant was no longer wanted, defendant told Vergara that Bobby was using drugs and should not be working on the residence.
Under these circumstances, evidence of the angry telephone calls tended to show that defendant bore a grudge toward Irwin and did not act in self-defense in killing him, and thus it was admissible under La. C.E. art. 404(B)(1).
In a motion in limine defendant filed in May 2009 as to these voicemail messages, defendant essentially argued that, even if the voicemails were admissible under La. C.E. art. 404(B)(1), pursuant to La. C.E. art. 403, the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, confu *47 sion of the issues, misleading the jury, or waste of time, and | athus should be excluded. In his pro se assignment of error on this issue, defendant essentially repeats that argument, submitting that the trial court erred by not excluding the voicemails under La. C.E. art. 40B. There is no merit to this argument. The voicemails were simply a recordation of defendant expressing his anger at several things relevant to the events leading up to his killing of Bobby Irwin. There is no indication that they caused him unfair prejudice or confused or misled the jury.
As to defendant’s pro se argument that the trial court erred when it admitted this Prieur evidence without a hearing, defendant actually notes in his argument that “[ajfter several hearings on this issue, not only were the phone calls admitted but so was the subsequent testimony of Nicholas Vergaro [sic] and Angela Mitchell, prejudi-cially.” A minute entry reflects that the State turned over the CD containing the three voicemail messages played for the jury, and five others, to defense counsel on May 13, 2009.
Defendant filed a motion in limine on May 22, 2009, seeking to bar introduction of all eight voicemail messages. The motion in limine came for hearing on June 18, 2009, and a minute entry for that date reflects that the court, the State, the defense, and defendant listened to the CD. A minute entry dated June 26, 2009 states that the trial court denied the “motion to suppress” the three voicemails submitted, and that the State and defense would argue the “remaining audio tapes” at a later date. Clearly, this is a reference to the voicemails. The only other telephone call at issue was the 911 call made by Jess Salts after the shooting, which, was on an audiotape.
A July 17, 2009 minute entry states that the State and the defense could not agree on what audiotaped conversations would be used at trial, and that the trial l^court would listen to the audiotape another time to determine what conversations would be allowed at trial. An August 7, 2009 minute entry states that the State withdrew audio-taped messages # 3, 4, 6 and 8; that the trial court would rule on message # 2 on the morning of trial; and that the court had previously ruled on messages # 1, 5 and 7. The record does not reflect that the court ever ruled on the admissibility of voicemail #2, left by Bobby Irwin on Angela Mitchell’s cell phone. However, that voicemail was not played for the jury.
The record clearly reflects that before admitting the three voicemails at issue, the trial court held several hearings to review them and heard argument as to their admissibility.
In his ninth pro se assignment of error, defendant also asserts that it was a Brady violation for the State to turn over the voicemails right before trial. In fact, the voicemails were turned over more than three months before trial, and the record reflects that the defense had no problem contesting their admissibility.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 5

In this assignment of error, defendant argues that the trial court erred in refusing to permit defendant to waive his presence at bench conferences, forcing him to be escorted past the jury on multiple occasions.
During a conference in chambers on the first day of trial testimony, concerning the admissibility of testimony the defense had objected to as hearsay, the following colloquy occurred:
THE COURT:
[[Image here]]
*48 Wait. Wait. Yes, Mr. Rubens?
THE DEFENDANT:
| gfiWell, I understand the concern with security. Why I got to come in with two people? I might as well be wearing orange out in front of the jury.
THE COURT:
You’re not coming in with two people. MR. HESSLER:
Your Honor, he’s talking about both deputies inside following him around. Your Honor, he has asked me numerous times to waive his presence in this, in these proceedings.
THE COURT:
It’s a second-degree murder case. I would prefer not to waive your presence. I believe that you should be present because of the severity of the charge. You need to be in chambers—
THE DEFENDANT:
Yes, ma-am.
THE COURT:
—knowing what is going on.
THE DEFENDANT:
Yes, ma’am.
THE COURT:
I don’t want these issues brought up if by chance there is an appeal in this matter. You need to be present.
THE DEFENDANT:
I’m not trying to be disrespectful.
THE COURT:
I—
MR. HESSLER:
Your Honor, could we — could we, in the future, have one deputy?
THE COURT:
As long as it’s a male deputy. Again, it is not for you so much. It’s for my security.
MR. HESSLER:
Well, I understand that, your Honor, but also, he’s got an interest here, and I think one deputy would be fine.
THE COURT:
One deputy is fine. It needs to be the male deputy.
Let’s go back.
LsLa.C.Cr.P. art. 831 sets forth the occasions when a defendant charged with a felony shall be present. La.C.Cr.P. art. 831(A)(4) expressly requires the presence of such a defendant “[a]t all times during the trial when the court is determining and ruling on the admissibility of evidence.”
Based on the colloquy quoted above, which is cited by defendant in his counseled appellate brief as the sole basis of this assignment of error, it is not at all clear that defendant definitively sought to waive his presence at in chambers discussions. When the trial court explained to defendant that it “would prefer not to waive” defendant’s presence, explaining that because of the severity of the ease defendant should be present in chambers, knowing what is going on, defendant seemed to acquiesce, twice stating to the above explanation by the court: “Yes, Ma’am.” Defense counsel did not note any objection, but instead asked for one deputy to escort defendant in the future, and the trial court agreed.
In contrast to the situation presented in the instant case, a defendant typically complains on appeal that he was denied his right to be present at courtroom proceedings, bench conferences, or in-chambers conferences. Defendant cites no jurisprudence involving a case where a defendant’s request to waive his statutory right to be present at proceedings was denied. Defendant cites no authority for the proposition that a defendant has a due process right to waive the statutory requirement that a defendant charged with a felony be present at certain proceedings. Defendant *49 cites no authority for the proposition that the trial court abused its discretion in declining to permit him to waive his right to be present at in chambers conferences. Nor does defendant make an argument that he was prejudiced by having a single deputy escort him, along with the judge and 127attorneys, into chambers, to such an extent that it warrants the reversal of his conviction and sentence. Defendant simply argues that the trial court erred and “unfairly subjected him to being seen as a security risk every time he was escorted into chamber [sic].” Defendant does not request any relief for the alleged error.
The jury obviously was aware that defendant was charged with committing second degree murder. The juiy had been through voir dire, and the second day of trial had almost been completed by the time defendant raised the issue of waiving his right to be present in chambers. Thus, the jury was familiar with courtroom security measures and deputies being stationed in the court. Finally, once defendant voiced his concerns, the trial court granted defense counsel’s request that only one deputy escort defendant into chambers, noting that she believed at least one deputy was necessary for security reasons. The court strongly believed defendant needed to be present for the in chambers discussions.
Crediting the good sense and fairmind-edness of the jury, it cannot be said that the jury was improperly influenced by viewing defendant escorted into the judge’s chambers by a single deputy sheriff thirteen times to such an extent that it contributed to the guilty verdict. The guilty verdict rendered in this case was surely not attributable to any error by the trial court in denying defendant’s request to waive his presence. Thus, any such error was harmless beyond a reasonable doubt. State v. Robertson, 2006-1537, p. 9 (La.1/16/08), 988 So.2d 166, 172; State v. Barbour, 2009-1258, p. 14 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142, 1150, writ denied, 2010-0934 (La.11/19/10), 49 So.3d 396, cert. denied, — U.S.-, 131 S.Ct. 1477, 179 L.Ed.2d 302 (2011).
Finally, defense counsel did not allege in his motion for new trial that the trial court’s denial of his request that he be permitted to waive the statutory | ^requirement that he be present at all of the in chambers conferences involving evi-dentiary rulings and the one involving the discharge of a juror caused an injustice to him warranting a new trial. Had defendant urged such a ground at the time he filed his motion for new trial, which was filed on the day of sentencing, seven days after the guilty verdict was rendered, the trial court could have held a hearing at which it could have heard from some or all of the jurors who had rendered the verdict to ascertain whether viewing defendant being escorted into chambers by a deputy had any effect on their verdict in the case. See State v. Clark, 340 So.2d 208 (La.1976) (evidence adduced on motion for new trial revealed that only three of twelve jurors remembered seeing the defendants in handcuffs, and those jurors testified that it had no effect on their decision).
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 6

In his sixth assignment of error, defendant argues that the jury instruction permitting conviction by a non-unanimous jury was unconstitutional.
La. Const, art. I, § 17(A) provides that a case “in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.” La.C.Cr.P. art. 782(A) provides, in pertinent part, that “[c]ases in which punishment is necessarily confinement at hard *50 labor shall be tried by a jury composed of twelve jurors, ten of whom must concur to render a verdict.”
The punishment in defendant’s case, upon being found guilty as charged of second degree murder, was necessarily confinement at hard labor. The record contains no verdict sheet, and the trial transcript reflects the return of the verdict, but not the number of jurors who concurred to reach the verdict. Defense counsel | ?gdid not request a polling of the jurors for the record, and in fact replied in the negative when asked whether he had viewed the juror polling slips at a bench conference following the verdict.
The record does not reflect that defendant filed a motion to declare unconstitutional the non-unanimous jury verdict portions of either La. Const, art. I, § 17(A) or La.C.Cr.P. art. 782(A). Nor does the jury instruction conference reflect that defense counsel objected to the jurors being charged as to the requirement that ten of twelve of them must concur to render a verdict, as per La.C.Cr.P. art. 782(A). Defendant argues in brief that if a non-unanimous jury verdict is a violation of due process, the verdict cannot stand, “absence of timely objection notwithstanding.” Defendant notes that by making the claim, he is preserving his rights as to the issue.
In State v. Collins, 2010-1181 (La.App. 4 Cir. 3/23/11), 62 So.3d 268, this Court held that because the defendant failed to object to the jury charge, in accordance with La.C.Cr.P. art. 930.4, it was procedurally barred from considering the defendant’s constitutional challenge to La.C.Cr.P. art. 782. Collins, 2010-1181, p. 12, 62 So.3d at 275, citing State v. Bertrand, 2008-2215, p. 8 (La.3/17/09), 6 So.3d 738, 743. In Collins, this court also held that because the defendant did not request that the jury be polled, the record did not reflect whether the jury rendered a non-unanimous verdict in this case. Thus, this Court noted, the defendant lacked standing to raise the issue, as there was nothing to show he was actually harmed by the purported error. This Court found no merit to the assignment of error.
In the instant case, as in Collins, defendant is procedurally barred from raising this issue. The record does not reflect that he objected to the jury |^instruction under La.C.Cr.P. art. 782(A). In addition, defendant lacks standing to raise the issue because he did not request that the jury be polled for the record.
Finally, even assuming defendant was entitled to raise the issue on appeal, for the following reasons, there is no merit to the claim.
In State v. Boudreaux, 2008-1504 (La.App. 4 Cir. 9/29/10), 48 So.3d 1144, writ denied, 2010-2434 (La.4/8/11), 61 So.3d 682, this Court noted:
In State v. Bertrand, 2008-2215 (La.3/17/09), 6 So.3d 738, the trial court found that La.C.Cr.P. art. 782(A) violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, relative to the number of jurors needed to concur to render a verdict in cases in which punishment is necessarily confinement at hard labor, the same issue raised by the defendant in the instant case. On direct appeal by the State, the Louisiana Supreme Court reversed, stating in its conclusion:
Due to this Court’s prior determinations that Article 782 withstands constitutional scrutiny, and because we are not presumptuous enough to suppose, upon mere speculation, that the United States Supreme Court’s still valid determination that non-unanimous 12 person jury verdicts are constitutional may someday be overturned, we find that the trial court erred in ruling that Article *51 782 violated the Fifth, Sixth, and Fourteenth Amendments. With respect to that ruling, it should go -without saying that a trial judge is not at liberty to ignore the controlling jurisprudence of superior courts. Bertrand, 2008-2215, p. 8, 6 So.3d at 743.
This Court cited and relied on Bertrand in State v. Barbour, 2009-1258 (La.App. 4 Cir. 3/24/10), 35 So.3d 1142, to reject the argument that the trial court had erred in denying the defendant’s motion to declare La.C.Cr.P. art. 782(A) unconstitutional as violative of the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.
As stated by the Louisiana Supreme Court in Bertrand, under current jurisprudence from the U.S. Supreme Court, non-unanimous twelve-person jury verdicts are constitutional, and La.C.Cr.P. art. 782(A) is constitutional.
Boudreaux, 2008-1504, pp. 38-39, 48 So.3d at 1165.
La.C.Cr.P. art. 782(A), providing for conviction upon concurrence of ten of twelve jurors in cases in which punishment is necessarily confinement at hard labor, is constitutional. There is no merit to this assignment of error.

PRO SE ASSIGNMENT OF ERROR NO. 2

Is;In his second pro se assignment of error, defendant argues that the trial court erred in permitting serious prosecutorial misconduct that severely prejudiced defendant, resulting in an unfair trial.
Defendant initially makes a blanket argument that there was false/perjured testimony; defense witness intimidation; Brady[2] violations; denial of attempts to impeach witnesses; denials of his right to cross-examine witnesses; “other crimes” evidence; and “highly prejudiced, inflammatory and untrue accusations made to the jury the entire trial.”
Defendant’s first specific argument is that the State made an improper opening statement that was “so patently false, prejudicial, and inflammatory that it effectively served to bias the jury for the trial that followed.”
“The opening statement of the state shall explain the nature of the charge, and set forth, in general terms, the nature of the evidence by which the state expects to prove the charge.” La. C.Cr.P. art. 766.
Defendant complains that one of the prosecutor’s assertions in his opening statement was that Ray Manning was going to have an “intervention” with defendant. The prosecutor said Manning was going to call New Orleans Police Department Second District units and the “entire neighborhood of people” who were involved with defendant who were like minded and go to Manning’s home. At that point, defense counsel objected:
MR. HESSLER:
Your Honor, I’m going to object to the general nature of everyone in the neighborhood. I think he better stick with the witnesses that he plans on calling instead of saying the entire city of New Orleans is upset with him.
MR. BOURQUE:
|S2CertainIy not the entire city of New Orleans.
THE COURT:
And again—
MR. HESSLER:
The entire neighborhood. I expect the entire neighborhood would testify to that.
THE COURT:
*52 Again, this is just the State of Louisiana’s opening statements. You will be instructed that statements made by attorneys during opening and closing arguments are just that. They’re not to be considered as evidence. Okay? You can continue, sir.
MR. BOURQUE:
You’re going to hear that Mr. Manning, along with several other homeowners and associated people, were going, planning, in the beginning stages of planning what they called an intervention with 2nd District Units, all to go to the house at one time to tell Mr. Rubens that this was it, he was finished working on their houses, and they wanted him out, and that they were gonna move his stuff out of Ray Manning’s house, help him move his stuff back to the North-shore or whatever he wanted to take it. Kindly, calmly, gently move Mr. Rubens out of his home, out of their neighborhood, out of their lives. That’s what they wanted to do. That’s how bad the situation had become.
Defense counsel did not object again during the State’s opening statement, making only the single objection above. The transcript reflects, as to this issue, that defense counsel objected only to the prosecutor’s use of the over-generalized term “the entire neighborhood” when referring to those who were planning this so-called “intervention.” When the prosecutor continued with his opening statement, he did not refer to the “entire neighborhood,” but only to “several homeowners and associated people.” Thus, the defense objection was cured.
To the extent that the defendant claims he was severely prejudiced by the prosecutor’s initial reference to the “entire neighborhood,” there is no merit to such a claim. Defense counsel made his point, and the jury could see that the prosecutor “corrected” himself by changing his reference from the “entire neighborhood” to | ¡¡¡¡“several homeowners and associated people.” Further, the trial court informed the jury that it would be instructed that opening statements were not to be considered as evidence. Finally, the trial court subsequently ruled inadmissible any testimony concerning the so-called intervention, after defense counsel raised the issue, before the jury was brought in on the fourth day of trial, and prior to Ray Manning testifying on behalf of the State. There is no merit to this claim of error.
Defendant attacks other portions of the prosecutor’s opening statement as well. However, as previously noted, defense counsel made only one objection during the State’s opening statement, and that matter was resolved. There were no objections to any of the matters of which defendant now complains. Therefore, those issues are not preserved for appellate review. An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La. C.Cr.P. art. 841.
Insofar as the necessity of an objection to preserve these issues for appellate review, defendant cites Namet v. U.S., 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), for the proposition that the U.S. Supreme Court recognized therein that even in the absence of an objection trial error may require reversal of a criminal conviction if: (1) it reflected prosecutorial misconduct; or (2) it obviously prejudiced the defendant. This is an inaccurate characterization of Namet. Namet simply referenced Federal Rule of Criminal Procedure 52(b), which, at the time, provided that “[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.” The Federal Rules of Criminal Procedure are not applicable in the instant *53 case, and Namet has no bearing on the instant case.
|a4In his second pro se assignment of error, defendant also argues that the State committed prosecutorial misconduct in several ways. In paragraph A, defendant argues that the prosecutor constantly led its witnesses in their testimony to introduce inadmissible hearsay, and when objections were made, the prosecutor would tell the trial court how to rule in its favor. While defendant asserts that this particular conduct by the prosecutor occurred from the testimony of State witness Kendra Lee throughout defendant’s entire trial, he simply cites one page of the trial transcript involving the direct examination of State witness Kendra Lee.
The prosecutor asked Kendra Lee, Bobby Irwin’s former wife, if at the time of Irwin’s death he had told her he was seeing anyone. Defense counsel objected, and the trial court sustained the objection, but noted that the prosecutor could rephrase the question. The prosecutor rephrased the question, and in answering Lee started to say that Irwin had told her something. Defense counsel objected again, and the prosecutor cited a hearsay exception that he believed applied. The matter was discussed in chambers, and the trial court ultimately ruled that the exception cited by the prosecutor did not apply. The court informed the prosecutor that there was another way to ask the question, but that the court could not tell the prosecutor what that was.
The fact that the prosecutor asked a question that he apparently incorrectly believed was covered by a hearsay exception does not constitute prosecutorial misconduct, even assuming the hearsay exception did not apply. Nor is there any merit to defendant’s argument that unspecified multiple instances of the prosecutor asking questions calling for hearsay answers is misconduct, since defendant has failed to establish any such instances.
| ^Defendant next argues in paragraph B that the prosecutor deliberately led State witnesses to testify falsely, knowing they were committing perjury. Defendant also avers that the trial court condoned this behavior and always ruled for the State, thereby resulting in an unfair and unconstitutional trial. Defendant cites a single trial transcript page number reflecting an in chambers conference to discuss an objection by the State to a question asked by defense counsel during his cross-examination of State witness Lynnette Metts. Defendant fails to establish that the prosecutor deliberately led any State witness to testify falsely. There is no merit to this claim.
In paragraph C, defendant asserts that the prosecutor did knowingly threaten, coerce, and intimidate a defense witness in violation of the U.S. Constitution and the Louisiana State Constitution. This is a reference to the statements made to Diana Hoover by the trial prosecutor and the District Attorney, a matter resolved in addressing defendant’s counseled Assignment of Error No. 3 and his Pro Se Assignment of Error No. 3.
Defendant further complains in this second pro se assignment of error that the prosecutor placed an 8 x 10 inch photo of the victim on the ledge of the witness stand during the testimony of his former wife, Kendra Lee, and then placed 24 x 36 inch crime scene photos of Bobby Irwin’s body on the witness bench across from the jury. The record does not reflect an objection by defense counsel to a photo being shown to Lee and identified by her as one she brought from home in Texas. Defense counsel expressly stated that he had no objection to that photo being published to the jury. Nor does the record reflect any *54 defense objection to the larger crime scene photographs being shown to the jury on the last day of trial. | ^Therefore, these issues are not preserved for review, and we cannot address them. La.C.Cr.P. art. 841.
Lastly, defendant asserts that the prosecutor testified through asking leading questions “a vast majority of the time,” thereby insuring that the State’s witnesses got their answers correct. Defendant claims that defense counsel objected repeatedly, only to be overruled in an abuse of discretion by the trial court. However, defendant does not cite a single instance of such conduct, and therefore fails to establish it.
There is no merit to this assignment of error.

PRO SE ASSIGNMENT OF ERROR NO. 4

In this assignment of error, defendant argues that he was denied exculpatory material in the State’s possession.
The record reflects that motions for discovery of exculpatory/impeachment material, including witness rap sheets, were filed by defendant’s original appointed counsel in October 2008 and by defendant, pro se, on January 12, 2009.
On November 14, 2008, the State filed its response to defendant’s counseled discovery motion, stating that defendant’s rap sheets had previously been tendered to defendant’s counsel, and that attached was a two-page rap sheet for witness Robert Salts and a six-page rap sheet for Ray Manning. Not until August 18, 2009 did the State file a response to defendant’s pro se discovery motion. In it, the State referred to “previously provided discovery” for most of the requests. The State objected to defendant’s request for juvenile adjudications of Robert Salts, as well as those of Byron Coppings, who was never called as a witness at trial. The State asserted that defendant was not entitled to that information.
^Defendant contends in his pro se appellate argument that exculpatory/impeachment evidence missing at the time of trial was:
1. The legally subpoenaed cell phone text messages;
2. The rap sheets of Byron Coppings;
3. The rap sheets of Ray Manning, all (6) six listed;
4. The rap sheets of Robert Irwin, since (9) nine were listed but only (3) three barely legible pages were produced;
5. The statement of Lynnette Metts and rap sheets;
6. The statement of Diana Hover and rap sheets;
7. The statement of Kendra Lee and rap sheets;
8. The statement of Lesia Neil and rap sheets;
9. The statement of Nicholas Vergara and rap sheets;
10. The statement of Angela Mitchell and rap sheets;
11. The statement of Esteban Ruiz Ser-vin and rap sheets;
12. The juvenile records of Jesse Salts.
The Louisiana Supreme Court set forth the applicable law on the State’s duty to disclose evidence favorable to the accused in State v. Bright, 2002-2793, pp. 5-6 (La.5/25/04), 875 So.2d 37, 41-42; as follows:
In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that suppression by the prosecution of evidence favorable to the accused after receiving a request for the evidence violates a defendant’s due process rights where the evidence is materi *55 al either to guilt or punishment, without regard to the good or bad faith of the prosecution. For purposes of the State’s due process duty to disclose, no difference exists between exculpatory evidence and impeachment evidence. State v. Kemp, 00-2228, p. 7 (La.10/15/02), 828 So.2d 540, 545. The Brady rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may determine guilt or innocence. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); State v. Knapper, 579 So.2d 956, 959 (La.1991).
Nevertheless, it is important to note that Brady and its progeny do not establish a general rule of discoverability, and not every case in which it is discovered post-trial that favorable evidence was withheld by the State will result in a reversal of the conviction. A prosecutor does not breach any constitutional duty to disclose favorable evidence unless the “omission is of sufficient significance to result in the denial of the defendant’s right to a fair trial.” United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). For purposes of Brady’s due process rule, a reviewing court determining materiality must ascertain:
not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. [Emphasis supplied.]
Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). See also, State v. Strickland, 94-0025, p. 38 (La.11/1/96), 683 So.2d 218, 234. Thus, the reviewing court does not put the withheld evidence to an outcome-determinative test in which it weighs the probabilities that the petitioner would have obtained an acquittal at trial or might do so at a second trial. Instead, a Brady violation occurs when the “evidentiary suppression ‘undermines confidence in the outcome of the trial.’ ” Kyles, 514 U.S. at 434, 115 S.Ct. at 1566 (quoting Bagley, 473 U.S. at 678, 105 S.Ct. at 3381).
2002-2793, pp. 5-6, 875 So.2d at 41-42.
Defendant cites nothing in the record that establishes or even suggests that any of the allegedly missing exculpatory/impeachment evidence existed, except for the juvenile adjudications of Robert Salts and Byron Coppings. Byron Coppings did not testify; therefore, any inquiry into this issue as to him is moot. The State replied to defendant’s requests for the juvenile adjudications by stating that defendant was not entitled to them.
La. C.E. art. 609.1(F) states:
F. Juvenile adjudications. Evidence of juvenile adjudications of delinquency is generally not admissible under this Article, except for use in proceedings brought pursuant to the habitual offender law, R.S. 15:529.1.
However, “[t]he extreme importance and constitutional status of the right to confrontation (which includes the reasonable opportunity to impeach the witness’s Incredibility) requires that any statutory right to confidentiality of juvenile proceedings under these circumstances must yield if the discrediting value of a prior juvenile adjudication is such that its disclosure is essential to a fair trial.” State v. Toledano, 391 So.2d 817, 820 (La.1980), on rehearing. This standard entails a balancing test to determine whether the impeachment value of the adjudication is outweighed by the State’s interest in maintaining the confidentiality of juvenile records. Davis v. Alaska, 415 U.S. 308, 319, *56 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974); State v. Smith, 437 So.2d 802, 804 (La.1983).
In Toledano, defense counsel moved the trial court for production of the juvenile rap sheet of the seventeen-year-old juvenile principal witness while cross-examining him during the defendant’s trial for first degree murder. The trial court denied the motion. Other witnesses connected the juvenile witness with a pistol that was shown by ballistic tests to have fired the fatal bullets. Both the defendant and the juvenile witness were initially charged with first degree murder. The juvenile subsequently pleaded guilty to manslaughter and agreed to testify against defendant. He testified that he was present in the victim’s apartment, in the bathroom, when he heard two shots. He came out and saw the defendant with a pistol in his hand and the victim lying dead on the sofa.
On rehearing, the Louisiana Supreme Court stated that not all juvenile adjudications of all State witnesses have a discrediting value that is sufficient to require disclosure and admissibility for impeachment purposes, but that a prior adjudication of a co-participant who has become a state witness may be sufficiently probative of the witness’s veracity to necessitate disclosure. Thus, the court held that “[u]n-der circumstances such as those presented in this case, the trial court, upon request by defense counsel for specific relevant evidence with possible | ^impeachment value, must order submission of the witness’ record of juvenile adjudications for an in camera inspection to determine its materiality.”
In State v. Alford, 521 So.2d 456 (La.App. 4 Cir.1988), two defendants were each convicted of two counts of aggravated kidnapping, two counts of armed robbery, and two counts of aggravated rape. They argued on appeal that the trial court had erred in refusing to issue a subpoena duces tecum — sought by the defense prior to trial — for production of the juvenile records, if any, of the two teenage female victims. Citing Toledano, this Court stated:
In the present case, it is not known if the victims had juvenile records and if they did, if those records contain information which would have affected the jury verdict. In accordance with Tole-dano, this case must be remanded to the trial judge for an in camera inspection of the victims’ juvenile records of prior adjudications, if they exist, and their discrediting value, if any. If the trial judge determines that the victims had juvenile records of prior adjudications that are so discrediting that there is a reasonable likelihood that they would have affected the jury verdict, then judgment reversing defendants’ convictions and ordering a new trial should be entered accordingly. If there are no records or records with no discrediting value, defendants’ convictions and sentences should be affirmed.
Alford, 521 So.2d at 458.
In a per curiam decision, State v. Perkins, 2003-1680 (La.6/27/03), 852 So.2d 989, the Louisiana Supreme Court stated, in toto:
When a defendant moves for production of the juvenile records of a witness the trial court is called upon to determine whether the impeachment value of these adjudications is outweighed by the state’s interest in maintaining the confidentiality of juvenile records. Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); State v. Toledano, 391 So.2d 817 (La.1980). As we have explained: “The critical question in cases involving a witness’s juvenile record and the sixth amendment right to confrontation is whether the defendant will be precluded from utilizing a meth *57 od of impeachment that would be effective in the circumstances of his case were the juvenile record available to defendant.” State v. Smith, 437 So.2d 802, 804 (La.1983). In reviewing juvenile records, the issue thus becomes whether the witness’s juvenile adjudications have such discrediting value that there is a reasonable likelihood it would affect the verdict. State v. Toledano, supra, 391 So.2d at 820. That determination can only be made after an examination of the juvenile record by the trial court and preservation of that record for review. State v. Hillard, 398 So.2d 1057, 1060 (La.1981). In the instant case, the Court of Appeal denied the defendant’s application for writs from the trial court’s ruling denying production of the juvenile records of two of the State’s primary witnesses without first reviewing those records, under seal, to determine if the trial court’s ruling with respect to the materiality of the prior juvenile adjudications was the correct one. This was error. The Court of Appeal’s writ denial in this matter is therefore vacated and this case is remanded to the Court of Appeal for the purpose of obtaining the juvenile records, under seal, and reviewing those records to determine whether the trial court erred in denying their production.
Perkins, 852 So.2d at 989-990.
Perkins implies that it was known that juvenile records of two of the State’s primary witnesses existed. In Perkins, the defendant moved the trial court to order the State to produce the juvenile records at issue for inspection by the trial court. Similarly, in Toledano, supra, the defendant moved the trial court for production of the juvenile rap sheet of the seventeen-year-old juvenile principal witness while cross-examining him during the defendant’s trial for first degree murder, and the trial court denied the motion. In Alford, supra, the trial court denied the defendants’ request for the issuance of a subpoena duces tecum for production of the victim-witnesses’ juvenile records.
In the instant case, even though the State did not reply to the defendant’s pro se request for discovery until the first day of trial, Robert Salts did not testify until the end of the third day of trial. La. C.Cr.P. art. 729.5 provides the trial court with the options when non-compliance with discovery occurs, including entering such orders as may be appropriate. Defendant failed to seek any relief from the trial court. Thus, defendant cannot now be permitted to complain on appeal of the State’s failure to comply with his motion for discovery.
As for the other alleged exculpatory evidence cited by defendant in this pro se assignment, the only thing the record suggests that was not turned over to l42defendant was the juvenile record of Robert Salts. Defendant fails to point to evidence that there were separate statements of the witnesses he lists, or that any of them had rap sheets that were not turned over to him. Accordingly, these arguments fail.
There is no merit to this assignment of error.

PRO SE ASSIGNMENT OF ERROR NO. 5

In this assignment of error, defendant argues that the trial court abused its discretion when it denied him compulsory process by failing to take action to secure subpoenaed incoming and outgoing text messages from Diana Hoover’s cellular telephone. The request for the subpoena was filed on July 20, 2009 and was directed to AT & T. The trial judge signed the subpoena on July 21, 2009, ordering AT & T to furnish copies of the text messages in court on August 7, 2009. A minute entry *58 reflects that on August 7, 2009, the trial court reissued the subpoena duces tecum previously filed by defense counsel.
Defendant submits that defense counsel learned that the text messages contained death threats against defendant, and that Hoover informed defendant and defense counsel that AT & T had a hold on her telephone records, and she could not get the text messages. Defendant contends that he was entitled to this evidence, as it would have been relevant to his contention that he knew nothing about any kind of a relationship between Hoover and Irwin, and that Irwin made death threats prior to the shooting.
Defendant asserts that defense counsel broached the subject of the text messages in a pretrial hearing, but no text messages were ever produced. Defendant does not point to a particular transcript page number or cite the date of such hearing. It is probable that this is a reference to the appearance on August 7, |4⅞2009, the date on which AT & T was to appear with the subpoenaed text messages pursuant to the subpoena duces tecum. At that August 7, 2009 hearing, the State withdrew certain audiotaped messages; other audiotapes were discussed; and the trial court reissued the subpoena duces tecum “previously filed” by defendant, presumably referring to one directed to AT & T. The record contains a number of instanter subpoenas issued to/served upon to various witnesses, but does not contain a subpoena duces tecum issued to/served upon AT & T.
“The right of a defendant to compulsory process is the right to demand subpoenas and the right to have those subpoenas served. This right is embodied in both the federal and state constitutions and in this state’s statutory law.” State v. Johnson, 2009-0582, pp. 5-6 (La.App. 4 Cir. 1/6/10), 28 So.3d 1167, 1170, citing State v. Duplessis, 2000-2122 (La.App. 4 Cir. 3/28/01), 785 So.2d 939; State v. Lee, 446 So.2d 334 (La.App. 4 Cir.1984); United States Constitution, Amendment 6; La. Const. Art. I, sec. 16 (1974); La. C. Cr. P. art. 731.
Defendant’s claim of error in the instant case is that the trial court erred and abused its discretion when it denied defendant compulsory process. However, the record reflects that the trial court reissued the subpoena duces tecum when AT & T did not show up with the copies of the text messages ordered to be produced. Defendant fails to point to anything in the record suggesting that the trial court was remiss with regard to the subpoena duces tecum. There is no indication that the defendant moved the trial court for any relief due to the apparent failure of AT & T to produce the text messages. Under these circumstances, it cannot be said that the trial court denied defendant compulsory process.
There is no merit to this pro se assignment of error.

PRO SE ASSIGNMENT OF ERROR NO. 6

|44In his pro se assignment of error number six, defendant argues that the trial court abused its discretion when it denied him the right to cross-examine the State’s witnesses, continually denying defense counsel any kind of impeachment and credibility challenges of those witnesses. He complains that the State’s constant objections and the trial court’s abuses of discretion in sustaining them deprived him of his right to cross-examine witnesses.
In State v. Huckabay, 2000-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, this Court set forth the applicable law pertaining to a defendant’s right to cross-examine witnesses against him, and the trial court’s *59 right to control that cross-examination, as follows:
An accused is entitled to confront and cross-examine the witnesses against him. La. Const, art. 1, § 16. La. C.E. art. 611(B) provides that a witness may be cross-examined on any matter relevant to any issue in the case. Due process affords a defendant the right of full confrontation and cross-examination of the State’s witnesses. State v. Van Winkle, 94-0947, p. 5 (La.6/30/95), 658 So.2d 198, 201-202. The trial court has the discretionary power to control the extent of the examination of witnesses as long as the court does not deprive the defendant of his right to effective cross-examination. State v. Hawkins, 96-0766 (La.1/14/97), 688 So.2d 473; State v. Robinson, 99-2236, p. 6 (La.App. 4 Cir. 11/29/00), 772 So.2d 966, 971. It has been held that evidentiary rules may not supercede the fundamental right to present a defense. Id. However, evidence may be excluded if it is irrelevant. See State v. Casey, 99-0023, pp. 18-19 (La.1/26/00), 775 So.2d 1022, 1037. Further, confrontation errors are subject to the harmless error analysis so the verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial was surely unattributable to the error. State v. Broadway, 96-2659, p. 24 (La.10/19/99), 753 So.2d 801, 817.
Huckabay, 2000-1082, pp. 25-26, 809 So.2d 1108.
Defendant first argues that the trial court erred when it sustained the State’s objections to defense counsel’s questioning of Ray Manning about receiving and cashing his deceased mother’s Social Security checks. The matter came up early in defense counsel’s cross-examination of Manning. Defense counsel had | ^possession of a check on an account bearing the names of both Manning and his deceased mother. The State objected to the line of cross-examination, stating that it knew where it was going. In chambers, defense counsel admitted that he planned on asking Manning why, several years after his mother’s death, he was still using a checking account that had a deceased person on it. Defense counsel said the reason was that Manning was depositing his deceased mother’s checks into that account.
Defense counsel asserted that he had a right to impeach Manning to show Manning’s bias and interest in the outcome of the case. The trial court found no merit to this argument, and defense counsel then claimed a right to pursue that line of questioning to impeach Manning’s honesty. Defense counsel admitted that he did not have any evidence that Manning was collecting his deceased mother’s Social Security checks and depositing them into that joint account. The trial court ruled the evidence inadmissible, noting that defense counsel acknowledged that he had no evidence that Manning was depositing his mother’s Social Security checks.
Defendant now argues that the trial court erred, that the evidence was admissible under La. C.E. art. 607(C) and (D). La. C.E. art. 607 states:
A. Who may attack credibility. The credibility of a witness may be attacked by any party, including the party calling him.
B. Time for attacking and supporting credibility. The credibility of a witness may not be attacked until the witness has been sworn, and the credibility of a witness may not be supported unless it has been attacked. However, a party may question any witness as to his relationship to the parties, interest in the lawsuit, or capacity to perceive or to recollect.
*60 C. Attacking credibility intrinsically. Except as otherwise provided by legislation, a party, to attack the credibility of a witness, may examine him concerning any matter having a reasonable tendency to disprove the truthfulness or accuracy of his testimony.
14f,P. Attacking credibility extrinsically. Except as otherwise provided by legislation:
(1) Extrinsic evidence to show a witness’ bias, interest, corruption, or defect of capacity is admissible to attack the credibility of the witness.
(2) Other extrinsic evidence, including prior inconsistent statements and evidence contradicting the witness’ testimony, is admissible when offered solely to attack the credibility of a witness unless the court determines that the probative value of the evidence on the issue of credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice.
“Intrinsic evidence is that elicited from the witness himself, while extrinsic evidence means any evidence other than the witness’ testimony.” State v. Cousin, 96-2973, p. 10, fn. 5 (La.4/14/98), 710 So.2d 1065, 1070, fn. 5, citing George W. Pugh, Handbook on Louisiana Evidence Law, Article 607, Authors’ Note (7) (1998).
We find that defense counsel did not have a right to attack Ray Manning’s credibility extrinsically pursuant to La. C.E. art. 607(D) by the elicitation of testimony from Manning. Any such testimony would have been intrinsic evidence, regulated by La. C.E. art. 607(C). Further, at the time of the objection, Manning had already admitted that he had issued checks under a joint account still open that was in the name of him and his mother. The only extrinsic evidence defense counsel had regarding this issue was a check written on the account, and evidence of it had been admitted.
The trial court found that the claim that Manning was illegally receiving and depositing his deceased mother’s Social Security checks into the joint bank account did not have a reasonable tendency to disprove the truthfulness or accuracy of Manning’s testimony. We agree.
|47Next, defendant argues that the trial court erred in denying defense counsel the right to question Manning about the wrongful death action filed by Kendra Lee, Bobby Irwin’s former wife. Defendant asserts that the trial court only permitted defense counsel to ask Manning if he had been named in the action. However, when this issue came up in chambers, the trial court informed the State that it did not see why defense counsel could not question Manning as to the existence of the civil action. Defense counsel volunteered that he knew he could not go into details, and that he could only disclose that Manning was a party to the suit and had a financial stake in the outcome of the suit. The trial court agreed. However, when defense counsel’s cross-examination of Manning continued, counsel did not ask any questions about the wrongful death action. Thus, there is no merit to this claim.
Defendant further contends that he was denied his constitutional right to cross-examine Lynnette Metts. Defendant cites a State objection to defense counsel’s question as to whether Bobby Irwin had told her that his parents died during Hurricane Katrina. The State objected to the relevance of this line of questioning. Defense counsel began to explain how it was relevant, then said he was changing his question. At that point, the trial court said it was sustaining the objection.
*61 Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. La. C.E. art. 401. Relevant evidence is generally admissible; evidence that is not relevant is not admissible. La. C.E. art. 402. Defendant fails to present any argument as to how the question about the death of Irwin’s parents during Hurricane Katrina was relevant. Thus, he 148has failed to show that the State should not have made the objection or that the trial court erred in sustaining it.
Defendant next complains of a State objection on the grounds of relevance as to a question of Metts concerning whether she witnessed an altercation in the homicide bureau office between Diana Hoover and a police officer during the immediate post-homicide investigation. Defense counsel replied that it was certainly relevant if something happened while Metts was giving a statement. The trial court noted that Metts had testified that she did not give a statement, but overruled the State’s objection anyway. Defense counsel then asked Metts if she was aware of a commotion occurring in the homicide office while she was giving her interview, and Metts replied in the negative. We find no error here.
Defendant discusses two more State objections during Metts’ subsequent cross-examination: one an “asked and answered” objection, the second an objection to relevance. In each case, the trial court overruled the State’s objections. The fact the State merely made the objections did not deprive defendant of his right to cross-examine witnesses.
Defendant complains of a State objection on relevance grounds when Metts was asked if she had prescriptions for Xanax and Lortab. The trial court ultimately sustained the objection, after much discussion in chambers. Defendant fails to show how the State objection was unwarranted. Therefore, there is no merit to his claim that he was denied his right to cross-examine Lynnette Metts in this regard.
Defendant also claims defense counsel was denied effective cross-examination of Metts as to whether she gave some of this prescription medication to Bobby Irwin to give to Diana Hoover. The State objected, and the trial court sustained the objection. Defendant fails to establish that the objection was |49unwarranted, or that the trial court’s sustaining of the objection was an abuse of discretion.
Defendant asserts that Metts stated on direct examination that defendant “had been ‘having her write checks that were insufficient funds totally’, which is about the only thing Metts said that was true ... these ‘insufficient funds’ were for Manning’s job through Hoover’s Regions Bank Metts [sic] testimony can only be read in its entirety; incredible.” This claim is unintelligible.
Defendant also complains that “[t]his” applies to the testimony of Jess Salts’ and Emily Shelton, as their testimony mirrored that of Metts, and that defense counsel was denied effective cross-examination of Salts and Shelton. Defendant fails to specify any particular instance when defense counsel was denied effective cross-examination of either Salts or Shelton. Thus, defendant fails to establish that he is entitled to any relief in this regard.
Additionally, defendant contends that it was prosecutorial misconduct for the State to continually object to defense counsel’s cross-examination of lead homicide Det. Robert Long, and an abuse of discretion for the trial court to sustain the objections. Defendant first points to a question concerning the post-homicide ap *62 pearance of the second-floor office in Ray Manning’s home where the shooting occurred. Defense counsel asked whether the location of a chair in the office, pushed all the way back against the wall in a corner, could be indicative of a struggle. The State objected that the question called for speculation, and the trial court sustained that objection.
The question as to the chair called for an opinion by Det. Long who, although a homicide detective, was essentially testifying as a lay witness. La. C.E. art 701 provides:
|finIf the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
(1) Rationally based on the perception of the witness; and
(2) Helpful to a clear understanding of his testimony or the determination of a fact in issue.
Under these circumstances, it cannot be said that the objection or the trial court’s sustaining of the objection was error. Further, Det. Long ultimately testified that there was no clear evidence of a struggle, and he believed defendant’s action in firing four shots, any of which would have been fatal, into the chest of the victim was excessive under the circumstances.
Defendant next complains of a State hearsay objection to a question posed to Det. Long regarding what witnesses told him when he was deciding if he should secure an arrest warrant for defendant. The trial court sustained the objection, telling defense counsel to rephrase the question. Defense counsel then asked Det. Long if it was a fact that a number of witnesses told him something. The State objected again to hearsay, and defense counsel withdrew the question.
Defense counsel continued to attempt to get Det. Long to explain the basis of the arrest warrant for defendant. The State objected numerous times. Sometimes the trial court sustained the objections; sometimes the trial court asked defense counsel to rephrase the question. Defendant fails to articulate how the trial court erred in its actions, other than arguing generally that the court abused its discretion in sustaining the objections. Moreover, the reasons why Det. Long obtained the arrest warrant for defendant came out at trial.
Defendant cites to ten pages of Det. Long’s testimony in which there were numerous objections by the State, and concluding that “it just goes on and on in |fi1Long’s testimony.” However, defendant fails to present a logical argument specifically stating why the trial court’s actions constituted an abuse of discretion or why the State’s objections deprived defendant of his right of effective cross-examination.
Defendant further argues that the omission from Det. Long’s police report of his head wound, as well as the omission of “these death threats” in his report, are facts that the jury should have heard. The jury heard testimony about the so-called head wound, which Det. Long characterized as a small scabbed-over spot. It is not clear which “death threats” are the ones to which defendant refers. However, in Pro Se Assignment of Error No. 7, defendant essentially concedes that the jury did hear about the death threats, but that Metts falsely testified that she did not know to whom she mentioned the death threats. These instances did not result in defendant being unconstitutionally deprived of his right to cross-examine witnesses.
Defendant also argues that defense counsel should have been allowed to ask about numerous issues covered in Det. Long’s supplemental police report. How *63 ever, defendant fails to explain how defense counsel was denied the right to ask Det. Long about these issues.
In conclusion, we find no merit to the argument that the State deprived defendant of his right to cross-examine witnesses by making evidentiary objections. We also reject the contention that the trial court erred in sustaining State objections, thereby depriving defendant of his right to cross-examine witnesses to such an extent that he sustained substantial prejudice warranting the reversal of his conviction and a new trial.
There is no merit to this assignment of error.

PRO SE ASSIGNMENT OF ERROR NO. 7

| r,2In his seventh pro se assignment of error, defendant asserts that the trial court erred in permitting the State to knowingly introduce false and perjured testimony over defense objections. Defendant points to testimony by Lynnette Metts, Jess Salts, and Emily Shelton as being false and perjurious.
Defendant cites Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), holding that where a prosecutor allows a State witness to give false testimony without correction, a reviewing court must reverse the conviction if the witness’s testimony reasonably could have affected the jury’s verdict, even if the testimony goes only to the credibility of the witness. 360 U.S. at 269, 79 S.Ct. at 1177; accord State v. Broadway, 96-2659, p. 17 (La.10/19/99), 753 So.2d 801, 814; State v. Williams, 338 So.2d 672, 677 (La.1976). To prove a Napue claim, the defendant must show that the prosecutor acted in collusion with the witness to facilitate false testimony. Broadway, 96-2659, p. 17, 753 So.2d at 814. Furthermore, fundamental fairness, i.e., due process, is offended “when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.” Napue, 360 U.S. at 269, 79 S.Ct. 1173. When false testimony has been given under such circumstances, the defendant is entitled to a new trial unless there is no reasonable likelihood that the alleged false testimony could have affected the outcome of the trial. Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). However, the grant of a new trial based upon a Napue violation is proper only if: (1) the statements at issue are shown to be actually false; (2) the prosecution knew they were false; and (3) the statements were material. United States v. O’Keefe, 128 F.3d 885, 893 (5 Cir.1997). The court in O’Keefe elaborated on the materiality element of the analysis, stating:
| ssThe Supreme Court has recently defined materiality in terms of a “reasonable probability” of a different outcome. Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). Such a reasonable probability results when nondisclosure places the case in a different light so as to undermine confidence in the verdict. Id. at 435, 115 S.Ct. at 1566. The relevant inquiry examines the challenged evidence collectively, not on an item-by-item basis. Id. at 436, 115 S.Ct. at 1566-67. “To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed by the record.” Yates v. Evatt, 500 U.S. 391, 403, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991).
O’Keefe, 128 F.3d at 894.
Defendant recites the substance of, and sometimes quotes, allegedly false testimony by Metts, Salts, and Shelton. He does not point to a particular page in the trial transcript for any references to Metis’s *64 allegedly false testimony. In Salts’ case, defendant cites several pages in the trial transcript where allegedly false testimony is located, and a range of pages where Shelton’s allegedly false testimony is located.
However, nowhere in this assignment of error does defendant point to evidence establishing that any testimony by Metts, Salts, or Shelton was false, internally inconsistent, or inconsistent with testimony of other witnesses or with other evidence.
Thus, defendant has failed to make the necessary threshold showing under Napue that any testimony or statements by Metts, Salts, or Shelton was false. Accordingly, there is no merit to this claim of error.

PRO SE ASSIGNMENT OF ERROR NO. 8

In his eighth pro se assignment of error, defendant alleges that the trial court abused its discretion when it constantly and consistently allowed the admission of inadmissible hearsay over the objections of defense counsel.
| .^Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. State v. Holmes, 2006-2988, p. 68, fn. 27 (La.12/2/08), 5 So.3d 42, 87, fn. 27, citing La. C.E. art. 801(C); State v. Moore, 2010-0314, p. 4 (La.App. 4 Cir. 10/13/10), 57 So.3d 1033, 1037. Hearsay is not admissible except as otherwise provided by statute. Moore, supra, citing La. C.E. art. 802.
Defendant first cites testimony by Kendra Lee, victim Bobby Irwin’s former wife. The trial court sustained defense counsel’s hearsay objection to the question as to whether, before his death, Bobby Irwin told Lee he had been seeing anyone. The trial court told the prosecutor he could ask the witness if she had knowledge. The prosecutor rephrased the question, but Lee started to answer by stating that Irwin had spoken to her, at which point defense counsel objected on hearsay grounds. The trial court effectively sustained the objection, instructing Lee that she could not testify to what someone had said to her. The matter was taken into chambers, and upon resuming direct examination of Lee, the prosecutor asked her if she knew who Bobby had been seeing at the time of his death. She replied in the affirmative, without objection by defense counsel. The prosecutor next asked the witness who the person was, and, again without any defense objection, Lee said the person was Diana Hoover. Defense counsel failed to object in any way to the subsequent questions and answers by Lee; thus, the trial court did not err in permitting the testimony.
Defendant next points to a question asked by the prosecutor of Lynnette Metts regarding what she knew about monies owed by defendant to Diana Hoover. However, defense counsel objected on the ground of hearsay, and the trial court sustained the objection.
| ^Defendant next complains of what he characterizes as “even the admissible hearsay” by Jess Salts, wherein Salts was asked by the prosecutor if Bobby Irwin told him something about trying to reach Diana Hoover. Salts answered by stating that Bobby would go outside when he talked to Hoover and did not know whether Bobby had reached Hoover on his cell phone or not. The answer was not hearsay.
Defendant makes a general argument about inadmissible hearsay by Kendra Lee, Lynnette Metts, Jess Salts, Nicholas Vergara, Angela Mitchell, Emily Shelton and Ray Manning. However, he only specifies these three foregoing instances *65 involving Lee, Metts, and Salts, two which involved the trial court sustaining defense hearsay objections and one not even involving hearsay.
Defendant has failed to establish any trial court error or denial of his rights as to this pro se assignment of error. There is no merit to this assignment of error.

PRO SE ASSIGNMENT OF ERROR NO. 10

In his tenth pro se assignment of error, defendant argues that the trial court erred and abused its discretion in failing to rule on defendant’s motions for return of his property from police, a 2005 Ford E250 van and its contents, musical instruments purportedly worth thousands of dollars, (including one guitar defendant alleged was worth at least $250,000.00). This matter is not relevant to defendant’s conviction and sentence, and thus is outside the scope of this appeal.

PRO SE ASSIGNMENT OF ERROR NO. 11

In his eleventh pro se assignment of error, defendant argues that the trial court erred and abused its discretion by permitting State witnesses to listen to each other’s testimony, thus violating sequestration. However, defendant negates his argument of trial court error and abuse of discretion by stating in his argument that “[t]he transcripts are riddled with the trial court interrupting the proceedings to run |fifithese witnesses out after sequestration was ordered.” Defendant fails to cite a single instance where the trial court failed to enforce its sequestration order after becoming aware of any violation thereof.
Moreover, defendant does not cite any objections by defense counsel as to violations of the sequestration order. Thus, he has failed to establish that he preserved the issue for review. La.C.Cr.P. art. 841. Nor does defendant point to any instance where defense counsel sought to have the trial court sanction the State for any violation of the sequestration order. See La. C.Cr.P. art. 21 (contumacious failure to comply with order sequestering a witness constitutes a direct contempt of court); see also La. C.E. art. 615 (providing for “exclusion” of witnesses — “[a] court may impose appropriate sanctions for violations of its exclusion order including contempt, appropriate instructions to the jury, or when such sanctions are insufficient, disqualification of the witness.”).
There is no merit to this assignment of error.

PRO SE ASSIGNMENT OF ERROR NO. 12

In his twelfth pro se assignment of error, defendant argues that the trial court erred and abused its discretion in failing to transcribe bench conferences. Defendant submits that there were at least twelve to twenty bench conferences, and only two were transcribed. He contends that the appellate record is therefore incomplete and not adequate to review his assignments of error, and he is entitled to a new trial.
La. Const. Art. I, § 19 provides that “[n]o person shall be subjected to imprisonment ... without the right of judicial review based upon a complete record of all evidence upon which the judgment is based.” In addition, La.C.Cr.P. art. 843 requires, in all felony cases, the recording of “all the proceedings, including | fi7the examination of prospective jurors, the testimony of witnesses, statements, rulings, orders, and charges by the court, and objections, questions, statements and arguments of counsel.” However, a defendant is not entitled to relief absent a showing of prejudice based on the missing portions of the record. State v. Simmons, 99-1154, p. 10 (La.App. 4 Cir. 12/6/00), 779 So.2d 856, 862-863, citing State v. Castle- *66 berry, 98-1888, p. 29 (La.4/13/99), 758 So.2d 749, 773. Also, a “slight inaccuracy in a record or an inconsequential omission from it which is immaterial to a proper determination of the appeal” would not cause a court to reverse a defendant’s conviction. State v. Allen, 95-1754, p. 11 (La.9/5/96), 682 So.2d 713, 722.
In State v. Hoffman, 98-3118 (La.4/11/00), 768 So.2d 542, the Louisiana Supreme Court stated, specifically as to the recordation of bench conferences:
This court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La.Code Crim. Proc. art. 843. Still, art. 843’s description of “objections” and “arguments” will normally apply only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments rise to a level of materiality sufficient to invoke art. 843. Similarly, Art. I, § 19’s command to record “evidence” does not encompass bench conferences, at least, not ones that do not satisfy the materiality requirements of La.Code Crim. Proc. art. 843. [Footnote omitted.]
98-3118, p. 50, 768 So.2d at 586-587.
A thorough review of the record reveals that there were twenty-four bench conferences, only one of which was recorded. In a number of instances, a bench conference was held, and then subsequently the court would go into chambers and go on the record to discuss in depth the subject matter of the bench conference. On other occasions, the outcome of the bench conference was clearly favorable to the defendant. Overall, defendant has failed to establish how he was prejudiced by the failure to record the bench conferences. This assignment of error lacks merit.

_yPRO SE ASSIGNMENT OF ERROR NO. 13

In this thirteenth pro se assignment of error, defendant argues that prosecutorial misconduct rendered his counsel ineffective. He essentially combines all of the previously discussed alleged acts of misconduct by the prosecutor and the alleged trial court errors, and avers that they amounted to prosecutorial misconduct that rendered his counsel ineffective.
“As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post-conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted.” State v. Howard, 98-0064, p. 15 (La.4/23/99), 751 So.2d 783, 802. However, where the record is sufficient, the claims may be addressed on appeal. State v. Bordes, 98-0086, p. 7 (La.App. 4 Cir. 6/16/99), 738 So.2d 143, 147. Ineffective assistance of counsel claims are reviewed under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). State v. Brooks, 94-2438, p. 6 (La.10/16/95), 661 So.2d 1333, 1337 (on rehearing); State v. Robinson, 98-1606, p. 10 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 126. In order to prevail, the defendant must show both that: (1) counsel’s performance was deficient; and (2) he was prejudiced by the deficiency. Brooks, supra; State v. Jackson, 97-2220, p. 8 (La.App. 4 Cir. 5/12/99), 733 So.2d 736, 741. Counsel’s performance is ineffective when it is shown that he made errors so serious that counsel was not functioning as the “counsel” guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064; State v. Ash, p. 9 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 669. Counsel’s deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. *67 To carry his burden, the defendant must show that there is a reasonable probability that, but for]^,counsel’s deficient performance the result of the proceeding would have been different; “[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 698, 104 S.Ct. at 2068; State v. Guy, 97-1387, p. 7 (La.App. 4 Cir. 5/19/99), 737 So.2d 231, 236.
This court has previously recognized that if an alleged error falls “within the ambit of trial strategy” it does not “establish ineffective assistance of counsel.” Bordes, 98-0086, p. 8, 738 So.2d at 147, quoting State v. Bienemy, 483 So.2d 1105, 1107 (La.App. 4 Cir.1986). Moreover, as “opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” Id. quoting State v. Brooks, 505 So.2d 714, 724 (La.1987).
The record fails to show that counsel’s performance was deficient such that there is a reasonable probability that, but for any such deficient performance by counsel, the result of the proceeding would have been different. Thus, counsel’s assistance was not ineffective. Given that counsel’s assistance was not ineffective, it necessarily follows that no act by the prosecutor or error by the trial court rendered counsel’s assistance ineffective.
There is no merit to this assignment of error.

PRO SE ASSIGNMENT OF ERROR NO. 14

In his fourteenth pro se assignment of error, defendant argues that the trial court erred in assessing appellant court costs without due process of law. Defendant cites a November 2, 2009 docket master entry that states:
DEFENDANT PETER RUBENS HAS FAILED TO PAY THE REQUIRED FINES AND FEES AS ORDERED BY THE COURT. JjjjAN ALIAS CAPI-AS WAS ISSUED THIS DATE IN THE AMOUNT OF $20,000.00 FOR THE ARREST OF THE DEFENDANT. THE DEFENDANT IS AT LARGE.
This issue is outside the scope of defendant’s instant appeal from his conviction and sentence. Defendant’s right to raise this issue in the trial court is reserved.

PRO SE ASSIGNMENT OF ERROR NO. 15

In his final pro se assignment of error, defendant argues that the trial court erred in denying admission of character evidence about Bobby Irwin.
La. C.E. art. 404 states, in pertinent part:
A. Character evidence generally. Evidence of a person’s character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
[[Image here]]
(2) Character of victim, (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible; provided further that when the accused pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused *68 lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further provided that an expert’s opinion as to the effects of the prior assaultive acts on the accused’s state of mind is admissible; or (b) Evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;.... [3]
| k. Here, defendant does not refer to any limitation by the trial court as to his presentation of evidence of alleged threats made against him by Bobby Irwin or the fact of Irwin’s drug use. In fact, defendant argues that the State “opened the door” as to Irwin’s character with its own disclosures that Irwin had three different illegal drugs in his system at the time he was killed, that Irwin had made threats against defendant wherein death was indicated, and that Irwin was a black belt in martial arts.
Defendant argues that numerous times, he attempted to lay the proper foundation that witnesses were very familiar with Irwin’s reputation as a lifelong illegal drug user. Defendant contends he could have proven that Irwin had this reputation, that it caused his divorce and cost him many jobs, and that he was, at the time of his death, an illegal drug dealer.
Defendant cites La. C.E. art. 405, which simply provides the methods through which evidence of character or a character trait, if admissible under La. C.E. art. 404, may be proven. However, defendant fails to establish that the type of evidence he claims he was entitled to prove was character evidence or evidence of a character trait that was admissible under La. C.E. art. 404, or any other provision or rule of law.
Defendant also argues that the evidence was admissible under La. C.E. art. 406, relative to evidence of the habit of a person or of the routine practice of an organization, which states:
Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice. The evidence may consist of testimony in the form of an |fi;>ppinion or evidence of specific instances of conduct sufficient in number to warrant a finding that the habit existed or that the practice was routine.
“ ‘Habit’ is a course of behavior of a person regularly repeated under like circumstances.” Pugh, Force, Rault, and Triche, Handbook on Louisiana Evidence Law, La. C.E. art. 406, Authors’ Note (1) (2011). Defendant fails to show how Bobby Irwin’s alleged history of lifelong drug abuse, which allegedly caused his divorce and cost him many jobs, or the fact that at the time of his death he was allegedly a drug dealer, was evidence of habit. Moreover, any such evidence would have been irrelevant insofar as defendant’s self-defense claim.
There is no merit to this assignment of error.

*69
CONCLUSION

For the foregoing reasons, the defendant’s conviction and sentence are affirmed.

AFFIRMED

BONIN, J., concurs in part, dissents in part and assigns reasons.

. When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Marcantel, 2000-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55; State v. Hearold, 603 So.2d 731, 734 (La.1992).

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

. NOTE: La. C.E. art. 412 is not applicable in the instant case, as it concerns evidence of the victim's past sexual behavior in sexual assault cases.